WILLIAM H. PICKENS, APPELLEE V. PLATTSMOUTH IN-
VESTMENT COMPANY, PLATTSMOUTH LAND & IM-
PROVEMENT COMPANY ET AL., APPELLANTS.

FILED JUNE 29, 1893.    No. 3901.

1. **Mechanics' Liens**: VENDOR CONTRACTING FOR IMPROVE-
MENT: PRIORITIES.  The vendor in an executory contract for
the sale of land will subject his rights in the property to be con-
veyed to a mechanic's lien by directly, though in conjunction
with the vendee, contracting for those improvements for the con-
struction of which such mechanic's lien is sought to be enforced.

2. ——: ——: ——.  If a vendee in possession of real property
by virtue of an executory contract for the purchase of the
same, erects improvements thereon, the rights of the vendor in
said property are not thereby, of necessity, postponed to the lien
of the mechanic or material-man under the mechanics' lien law.
Such postponement can only be predicated upon a contract of
the mechanic or material-man  with the vendor directly, or
through his agent, and such essential contract must be proved as
must any other necessary proposition of fact.

REHEARING of case reported in 31 Neb., 585.

O. H. Ballou and W. L. Browne, for appellants.

J. B. Strode and Matthew Gering, contra.

RYAN, C.

This appeal has already received the consideration of
this court, as will appear by a reference to 31 Neb., 585,
where will be found the opinion of COBB, J., reversing the
decree of the district court of Cass county.  A rehearing
having been granted, it is necessary that the decree ap-
pealed from be examined anew in the light of the evidence
upon which the cause was originally heard.  In the trans-
actions to be considered there are two corporations, co-
defendants, the names of which are so similar that, without

great care, one is liable to be mistaken for the other. One of these corporations was the Plattsmouth Land & Improvement Company; the other was the Plattsmouth Investment Company. The liability to confusion in the use of these designations is well illustrated in the opinion above referred to as reported in 31 Neb., 585; for there this case is entitled "*William H. Pickens v. Plattsmouth Land & Investment Company et al.*" That these appellant corporations may not be confounded, more than usual care is necessary in stating the facts. The Plattsmouth Land & Improvement Company originally owned the land upon which was built the Park House, for the erection of which the enforcement of a mechanic's lien was had in this case. Before any steps were taken for the construction of this building, the Plattsmouth Land & Improvement Company made an executory contract with the Plattsmouth Investment Company to convey to it the real property upon which was erected the Park House. The terms of this contract have not been put in evidence; indeed, from the testimony, it is somewhat doubtful whether this contract was oral or written. In the former opinion it was described as a parol contract, which designation we are inclined to regard as a misnomer for the following reasons: It is nowhere so spoken of by any witness; the only mention of it and of the status of matters under it are found in the record in the language of Dr. Hertzman, whose relation to such company will hereafter appear. He testified as follows:

Q. The Plattsmouth Land & Improvement Company sold a portion of this ground out there known as the Livingston Heights to the Plattsmouth Land & Investment Company?

A. No, sir; the Plattsmouth Investment Company had a contract.

Q. When was that done?

A. I could not tell you without referring to the contract.

Q. Do you remember about the date?

21

A. No, sir, I don't.

Q. Was that done prior to the time of the building of the Park House?

A. Yes, sir.

Q. How long prior?

A. As far as dates is concerned I could not give it to you exactly, but it seems to me it was some little while previous to that time; the contract will, of course, show, but I don't remember the dates. * * *

Q. They (the investment company) have no interest in the real estate at present?

A. Nothing, only that they hold a contract, and the payment they made they have an equity in it.

Q. Do you know what interest they have in it?

A. I could not say at present; I know I could not tell you at present, it would be impossible. If you will allow me I can explain possibly so you can understand it; the fact of the matter is they have no interest in it.

Q. These improvements done by the investment company were done with the knowledge and consent of the improvement company?

A. No, sir; they had nothing whatever to do with it.

Q. Did they know of it?

A. I suppose they knew we had bought the ground of them by contract. I expect they knew we were trying to boom the property, and they knew we were going to build.

Q. Have their interests in this contract ever been closed out in any way, the improvement company's interest under the contract?

A. No, sir.

Q. It just stands under contract still?

A. Yes, sir.

Q. You do not know how much the Plattsmouth Investment Company paid under that contract?

A. I could not say exactly; no, sir.

Q. Was the contract made a matter of record between

the Plattsmouth Investment Company and the Plattsmouth Improvement Company?

A. Yes, sir; and it is in the record in the office of the company; of course we can record a contract, as I understand it, without being acknowledged.

Q. You mean of record in the county clerk's office?

A. No, sir.

Question by the court: Do you know about how much they paid the investment (improvement?) company on that contract?

A. It seems to me it is in the neighborhood of $1,100; I don't know exactly. The company has never paid any interest to the Plattsmouth Land & Improvement Company; they have never been able to, because the stockholders refused to pay.

Q. What was the contract price?

A. I don't know that without referring to the contract.

From this testimony it seems established that at the time when the contract was made to build the Park House the Plattsmouth Investment Company held a written executory contract for the purchase of the real property upon which the Park House was to be built; that it had possession and control of said real property and has paid on its purchase price about the sum of $1,100; though at what date is entirely left to conjecture. It seems probable also that the Plattsmouth Land & Improvement Company had knowledge of the design of the investment company to boom the property, and with that view the Park House was to be built. Whether or not the Plattsmouth Land & Improvement Company was more directly interested than above in the promotion of this enterprise is the question essential to the determination of this appeal.

The foregoing evidence of Dr. Hertzman was presented with a promise to define his relation to the two Plattsmouth companies above referred to, which, as it will now appear, is a matter of some little difficulty. Testifying, he said,

in substance, that in July, 1887, he was a stockholder in the Plattsmouth Investment Company; was not a stockholder in the Plattsmouth Land & Improvement Company; was at that time its secretary and so continues until this day. When shown a letter (which is not found in the bill of exceptions) and asked what meeting he referred to in it, Dr. Hertzman said: "I have referred to the meeting of the Plattsmouth Investment Company of which I was elected secretary after Mr. Gratton resigned, not the Plattsmouth Land & Improvement Company, but the Plattsmouth Investment Company, that is signed by me personally and not as secretary." When this resignation of Gratton and induction of Dr. Hertzman into the vacant office took place there is no means of determining. It would seem, however, that the doctor was, for a portion of the time covered by the history of this case, secretary of both these Plattsmouth companies, as well as a stockholder in the investment company.

Another personage who conspicuously figures is Dr. Samuel D. Mercer, who in July, 1887, when the contract was made with Pickens for the erection of the Park House, was president of the Plattsmouth Land & Improvement Company, and was originally its treasurer. The contract which Mr. Pickens entered into for the erection of the Park House was in writing, and in terms was with the Plattsmouth Investment Company. In relation to its inception, Mr. Pickens testified, in substance, that the first notice he had that the building was going up was in the early part of June, 1887, when Dr. Mercer sent for witness and gave him the plans and specifications for the Park House to be erected on Livingston Heights. The evidence of this witness continued thus:

Q. Is this property described and known as Livingston Heights the property I have read?

A. That is what he told me—Livingston Heights or Rural Park. I took the plans and specifications and looked

them over that day and he asked me if I could not give him a bid on it that day before I left Omaha, and I said no, that it would require me a couple of days anyhow, and I had some business to do that day and could not give it my full attention, but I gave him my idea of what I thought would be the actual cost of the Park House, so I brought the plans and specifications with me and he told me that as soon as I got my figures ready to forward them to him, which I done—my figures for the building of the Park House on or about July—I don't know the date of that dispatch. I received a telegram from Mr. Hertzman sometime in the forepart of July, 1887, to come up and sign contract for Park House. I went up there that evening and we talked the matter over and he added some porch—some extra porch on the Park House, which amounted to about $1,000; then Mr. Hertzman and me had some talk; he told me that Mr. Gratton and Mr. Heimrod would be down next day to locate the building and at that time I did not know just exactly who I was contracting with, or anything. I know that Mr. Hertzman was in Dr. Mercer's office all the time; they were in partnership there together and I supposed it was all the same. Mr. Mercer received my bid and handed it over to Mr. Hertzman, so the following day those gentlemen came down and laid out the buildings and numbered them where the buildings were to stand and was to let me know the next day by telegram the number of the knolls where to put the buildings; they numbered them; when they came down that day they contracted for a dancing pavilion.

Lest it might be understood that Dr. Mercer was one of the parties who came down, it is only fair to state that such was not the case.

Mr. Pickens also testified as follows:

Q. Now, have you demanded payment?

A. Yes, sir.

Q. From whom?

A. I have demanded payment from the parties with which I contracted, Dr. Mercer, Mr. Heimrod, and Mr. Gratton. I went and saw him about it; he was secretary, he claimed to be at that time, of some company.

Q. Who, Mr. Gratton?

A. Yes, sir.

Q. Which company, do you know?

A. I don't know; I think he signed it the Plattsmouth Land & Investment Company.

Continuing further the witness Pickens testified as follows:

Q. State whether you did contract with Dr. Hertzman and these other men.

A. Dr. Mercer was the man who gave me the plans and specifications in the first place to figure on the Park House plans and specifications which I brought down here and he told me to send them back just as soon as possible, that he needed them. He proposed to get some other figures.

Q. Who was you building this building for? Did you know at that time?

A. Yes, sir; I presumed it was for Dr. Mercer and the Plattsmouth Land & Improvement Company or Investment Company, or whatever they call themselves. I did not know what they were.

Q. Was Dr. Mercer down there while you was putting these improvements on there?

A. No, sir.

Q. Did you see him at any time after he gave you these plans?

A. Yes, sir.

Q. Did you talk to him about what you were doing?

A. Yes, sir.

Q. Did he know you were putting those improvements there?

A. Yes, sir; he knew they had went there; I did not see him while we were putting them there but he knew they

were there because he sent down for me just about the time I was going to file my lien and tried to compromise the thing with me in some way.

The confusion which existed in the mind of Mr. Pickens as to the name of the exact party for whom he was erecting this building, from the foregoing evidence, will seem pardonable. In the first place, the Plattsmouth Land & Improvement Company, the holder of the legal title, contracted to sell a portion of the real property to the Plattsmouth Investment Company, which latter company having taken possession of the property with a view of erecting improvements thereon and booming it, contracted with Pickens to erect the Park House. Dr. Hertzman and Dr. Mercer occupied the same office. When Mr. Pickens visited this office, Dr. Mercer, who at that time was president of the Plattsmouth Land & Improvement Company, handed to Mr. Pickens the plans and specifications for the erection of the Park House, and seems to have spoken of the building about to be erected in such terms as would naturally lead Mr. Pickens to infer that the work was to be performed for the Plattsmouth Land & Improvement Company. It is true the written contract, when formulated for the signature of Mr. Pickens, recognizes only the Plattsmouth Investment Company as the party with whom he was to contract. This company had possession of the property; has advanced at some time $1,100 for the purchase of it. Its interest has not yet been foreclosed, though the testimony of Dr. Hertzman, its secretary, is that the rights of the investment company have been forfeited. It seems to us upon a review of all the facts in this case, that the conclusion is unavoidable, that these companies were engaged in a joint enterprise, to-wit: the booming of this property; that in furtherance of the interest of both parties this contract was made for the erection of the Park House by the Plattsmouth Investment Company, as well as by the Plattsmouth Land & Improve-

ment Company. Just who the written contract was made with is not determinative of these facts. Both these companies interested in the ownership of the property were parties to the contract, at least by their conduct led Mr. Pickens to believe that such was the fact. The principle governing in such cases is stated and enforced by NORVAL, J., in *Bohn Mfg. Co. v. Kountze*, 30 Neb., 719. The syllabus of that case which was prepared by the writer of the opinion was as follows: "In a contract for the sale of land it was stipulated that the purchaser should erect a dwelling upon the premises within a stated time. The building was erected but the labor performed and material furnished were not fully paid for. Held, in an action to foreclose a mechanic's lien, that the liens of the mechanic and material-man have priority over the lien of the vendor for unpaid purchase money." Discussing the facts of that case as governed by the statute giving a mechanic's lien, Judge NORVAL in his opinion said: "The contract of sale in the case at bar not only authorized but made it obligatory upon the purchaser to erect a dwelling on the premises, of a certain value, within a fixed time. Further than that Kountze stipulated to furnish not to exceed $2,200 towards the erection of the building. The proof shows that Kountze advanced that amount and more, and that he approved the expenditure of the money. This is additional proof of the authority of the vendee to contract for the erection of the house. Kountze having in the contract of sale authorized his vendee to make the improvements, and in pursuance of that authority, Berlin procured the labor to be performed and the materials to be furnished, the vendor thereby subjected his lien for the unpaid purchase money to the liens that might be acquired by the laborer and material-man for making the improvement. Where a vendee, owning the equitable title, contracts for the erection of a building upon the express authority of the owner of the legal title, it is but just that the lien of the mechanic should attach to the interest

of both vendor and vendee in the premises, and be paramount to the lien of the vendor. And this rule does not in any manner contravene any statutory provision." In other words, section 1 of the mechanics' lien law, having provided that any person who shall perform any labor or furnish any material for the erection of any house by virtue of a contract, express or implied, with the owner thereof, or his agent, shall have a lien to secure the payment upon such house and the lot of land upon which the same stands, is to be liberally and fairly construed.

The owner of the lot, Kountze, having stipulated that improvements of a certain kind should be made thereon, by one who held his agreement upon certain payments being fully made to convey, constituted the vendee his agent for the erection of the building required by said contract. The sale of the material and furnishing of the labor were under a contract with the agent of the owner whose authority was to make the improvement required. Kountze did not actually assist in making a contract for the purchase of the material, and for securing performance of the necessary labor. He entered into such a contract as required another to do this, however, whereby that other was in fact his agent, either for the improvement of the property legitimately, or by overreaching the material-man and laborer through misleading appearances. The law imputes the more honorable motive and holds the implied agency an honorable one. Wherefore it results from the statute that the right to a mechanic's lien arose as against the interest, not only of the vendor, but of the vendee as well. By this it was not held that where the owner of the land sells it and simply takes back a mortgage for the purchase price without in any way becoming a party to a contract for the erection of improvements, that one who furnishes materials or labor upon a contract with the vendee alone can assert thereon a lien superior to that of the said mortgage duly recorded. Quite to the contrary it has been recently held by

this court in *Henry & Coatsworth Co. v. Fisherdick*, 37 Neb., 207, where one furnished money to build a house for which he took a mortgage upon the premises whereon the erection was to be made, that the record of such mortgage gave a priority to the rights of material-men and mechanics who began to confer value upon the mortgaged property after the record of the mortgage. To subject a vendor's rights in the subject-matter of the sale to the claim of mechanic's lienor, it must appear that, with respect to the value conferred by the labor or material of such lienor, there was a privity of contract through the vendee between the vendor and such lienor. This privity will not be implied from the mere fact that the mechanic's lienor, upon the faith of a contract between himself and such vendee, furnished labor or material. It must be established by the proofs, or as fairly inferable from the facts as any other independent fact or proposition. As between the appellee Pickens and the Plattsmouth Land & Improvement Company there were sufficient proofs to justify the district court in finding that the Plattsmouth Investment Company was the agent of its vendor for procuring the erection of the Park House upon the premises; or that court might properly have found from the evidence that the Plattsmouth Land & Improvement Company was a party to the contract for the erection of said house, and on either theory the decree should stand. The judgment of the district court is

AFFIRMED.

THE other commissioners concur.